```
 1                    BEFORE THE UNITED STATES DISTRICT COURT
                            FOR THE DISTRICT OF COLUMBIA
 2

 3      UNITED STATES OF AMERICA,           .
                                            .  Case Number 20-cr-202
 4              Plaintiff,                   .
                                            .
 5          vs.                              .
                                            .
 6      PASCALE CECILE VERONIQUE FERRIER,   .  January 7, 2022
                                            .  11:20 a.m.
 7              Defendant.                   .
        - - - - - - - - - - - - - - - - -

 8

 9                       TRANSCRIPT OF MOTION HEARING
                    BEFORE THE HONORABLE DABNEY L. FRIEDRICH
10                       UNITED STATES DISTRICT JUDGE

11

12      APPEARANCES:

13      For the United States:       MICHAEL FRIEDMAN, AUSA
                                     United States Attorney's Office
14                                   601 D Street Northwest
                                     Washington, D.C. 20579
15

16      For the Defendant:           DAVID BOS, AFPD
                                     EUGENE OHM, AFPD
17                                   Federal Public Defender's Office
                                     625 Indiana Avenue Northwest
18                                   Suite 550
                                     Washington, D.C. 20004
19

20      Official Court Reporter:     SARA A. WICK, RPR, CRR
                                     United States District Court
21                                       for the District of Columbia
                                     333 Constitution Avenue Northwest
22                                   Room 4704-B
                                     Washington, D.C. 20001
23                                   202-354-3284

24
        Proceedings recorded by stenotype shorthand.
25      Transcript produced by computer-aided transcription.
```

P R O C E E D I N G S

(All participants present via video conference.)

COURTROOM DEPUTY:  Your Honor, we are in Criminal Action 20-202, the United States of America versus Pascale Ferrier.

If I can have the parties identify themselves for the record, beginning with the United States.

MR. FRIEDMAN:  Good morning, Your Honor.  Michael Friedman for the United States.

THE COURT:  Good morning, Mr. Friedman.

MR. BOS:  Good morning, Your Honor.  David Bos on behalf of Ms. Ferrier.

MR. OHM:  And Eugene Ohm on behalf of Ms. Ferrier. Good morning, Your Honor.

THE COURT:  Good morning, Mr. Bos, Mr. Ohm, Ms. Ferrier.

For the record, this is a video conference being conducted pursuant to the Chief Judge's standing order relating to the pandemic.  I know that there was a desire to do this in person, but given the rising numbers with the pandemic and the omicron variant in particular -- is it fair to say, Mr. Hopkins, that all proceedings are shut down right now in the courthouse, even trials?

COURTROOM DEPUTY:  That's correct, and especially today.  Today, all hearings are conducted by video because of

1   the snow.

2          THE COURT:  Okay.  So anyway, just for Ms. Ferrier's

3   benefit, to the extent she doesn't understand why this is not

4   happening in person, that's the reason.  We simply can't do it

5   in person today.

6      But would you all like to proceed nonetheless, Mr. Bos or

7   Mr. Ohm?

8          MR. BOS:  Yes, Your Honor.

9          THE COURT:  Okay.  All right.  Well, I have before me

10  two motions.  I have Ms. Ferrier's motion for the return of

11  property and the government's motion for competency exam.  I've

12  read your briefs.

13     Do you all want to make any additional points?  Let's start

14  with the return of property motion.  Mr. Bos or Mr. Ohm,

15  anything else you would like to say with regard to that?

16         MR. OHM:  Just briefly, Your Honor.

17     I just wanted to point out that -- I know the government's

18  arguments centered around the stipulation and their lack of

19  desire to enter into one and their right not to, and I can

20  appreciate the point.  The reason that we raised it to begin

21  with was because the initial response from the government when

22  we asked for the property is, well, just in case we might need

23  it as evidence we would want a stipulation.

24     And it seemed like there was a point where the government's

25  position was that -- their third point in the brief, that they

1     were worried about some sort of safety concerns or other

2     concerns, that that was the reason they were objecting to the

3     return of property and that, you know, the sort of evidentiary

4     reason is they -- is failing as a concern.

5          There's no real relevance to the actual physical funds

6     itself, and obviously, Ms. Ferrier is in a situation where she's

7     isolated, especially given COVID, especially because she's not

8     an American and her family doesn't live here.  It makes it more

9     difficult for her.

10          THE COURT:  Explain that, Mr. Ohm.  In terms of what

11     she can do inside the jail?  In terms of access to provisions?

12          MR. OHM:  Yes, exactly.  In terms of ease of her

13     getting, I think, what normally most residents of the jail get,

14     some funding either from their personal accounts or from family

15     members, and that's just not something that's available to her.

16          I would also note that there was a couple hundred dollars

17     in Canadian money that was taken, and Mr. Friedman told me that

18     his position is the same for that, which I think really just

19     shows that there's no evidentiary value to having present

20     physical money at trial the way that the government is claiming

21     that they would like to do.

22          THE COURT:  Okay.  But in terms of provisions in the

23     jail, you don't need $2,296, in any event.

24          MR. OHM:  I've offered to Mr. Friedman that we would

25     take $100 and that we would come back and ask for more when she

1    needs it.  We're willing to accommodate anything that the

2    government wants to do, if they have additional concerns.  But,

3    you know, we figured that we would raise it with the Court in

4    its entirety.

5              THE COURT:  Okay.  And help me understand specifically

6    what it is at the jail that she wants and she can't get.

7              MR. OHM:  So for example, Your Honor, there's the

8    standard issued jail shoes, which I think the Court might have

9    seen before.  They're like little canvass orange things that are

10   really, I think, geared more towards men 19 to 25 years old than

11   women in Ms. Ferrier's demographic.

12       In terms of like body care, I think the Court has heard of

13   the difficult catering that -- the individuals that the DOC has

14   and that, you know, most of my clients, when they're able, they

15   want to supplement sometimes like the bologna sandwich that they

16   get for dinner with additional food from commissary because for

17   nutritional reasons.

18       There are things like radios that one is allowed to

19   purchase, and when somebody is in their cell for 23 hours a day,

20   you know, the capacity to be able to access that is important.

21       There's clothes.  When individuals want additional under

22   things, you know, they're provided a set amount for a period of

23   time, but if they need more, then they're told that they need to

24   buy more.  That also goes for toiletries.

25       So it is really -- and not to mention her ability to call

people on the telephone is something that requires her to have money in her account.

So again, Your Honor, we're not asking -- frankly, if Mr. Friedman is willing to administratively deal with it, we're happy to take $25 a week until it needs to -- until it's run down, and I'm happy to monitor her commissary records to make sure that she's not over a certain amount.  It's really just a matter of her being able to -- I don't want to say survive, but being able to exist in a way where she can access the funds that everybody is allowed to access.

THE COURT:  Thank you, Mr. Ohm.

Mr. Friedman, I would like to just hear your response to Mr. Ohm's points about a de minimis amount of money.  I think the law does support the government's position here.  To the extent in responding to this you want to go under seal, I'm certainly open to that as well.  I'm not asking you to do so, but I'm just wondering, appreciating that the government, I think, has set forth the grounds on why, first of all, this motion should be brought in the Western District of New York, but, secondly, this property could still be needed as evidence. I understand the government's position, but I also can appreciate what Mr. Ohm is saying about minimal amounts of money.

Can you -- I know that this is administratively difficult, perhaps, for the government and, perhaps, that's the strongest

1    response you'll make, but are there other reasons, too?  It's

2    hard to see why all of this money at trial would be displayed

3    there and be of -- every single dollar of evidentiary value.

4    Maybe you can help me understand.

5              MR. FRIEDMAN:  Your Honor, this is a serious case

6    where the defendant is accused of sending toxic ricin letters to

7    numerous different people in Washington, D.C., and also to eight

8    different individuals in the state of Texas.  And the defendant

9    indicated in written notes that came along with those letters

10   that she was intending to take further action to harm and to

11   injure those people.  There was references to coming there to

12   where those people are, references to, perhaps, using a gun when

13   she'll be able to come, and indications that maybe she would

14   find a better recipe for another poison.

15        And then shortly after mailing all of this, the defendant

16   came to the United States, or at least she drove her car from

17   Canada to the Peace Bridge border crossing in New York State,

18   and that's where she was arrested in possession of a firearm and

19   ammunition and other weapons and thousands of dollars in

20   currency.

21        So we think it's very clear that this currency is important

22   evidence for the reasons we set forth in our submissions, you

23   know.  The currency is, you know, powerful evidence of the

24   identity of the wrongdoer, her mental state around the time that

25   the criminal conduct was committed, her motive, her intent, and

her plans, and it's relevant evidence in this prosecution here in Washington, D.C., but also in an entirely different prosecution where the defendant has been charged in the Southern District of Texas with eight life sentence-eligible criminal offenses.

And I did at some point discuss with Mr. Ohm the possibility of a stipulation. I did not ever agree that we would agree to a stipulation, but I discussed that that was a possibility with him. We ultimately did not agree with it, and I always caveated my discussions with Mr. Ohm, in person and on e-mail, by explaining that numerous people have said that the Department of Justice would need to make a decision and authorize this. And ultimately, we don't agree to it.

It's powerful evidence to be able to show the jury at the trial what the defendant had in her possession when she came, including the full amount of the currency. There's doctrines in the law indicating that especially in a criminal case the government is allowed to present its case as it chooses, even if it presents duplicative evidence, and that's because the burden of proof is so high for the government in a criminal case.

And so, you know, we don't have any position on the defendant, you know, using funds to purchase any of the things that Mr. Ohm referred to earlier, but the currency that was seized at her arrest at the Peace Bridge border crossing is evidence, and it should only be disposed of at the close of the

relevant criminal proceedings, which includes this case and also in Texas.

THE COURT:  Okay.  Mr. Friedman, it sounds like you did consider the stipulation in the beginning.  Did your mind change in part because of the potential security risk, the money for phone calls and the like?

MR. FRIEDMAN:  Yeah, I mean, partially, and that's why we provided that information to the Court.  That was a relevant part of our decisionmaking.  And what we provided in a sealed filing indicates that this material is relevant for other reasons of interest to the government and that, you know, the concern about releasing it to the defendant for the reasons we've set forth in the sealed insert potentially would present great danger to the community, especially while matters are being investigated.

THE COURT:  All right.  Mr. Ohm, anything else you would like to state?

MR. OHM:  Very briefly, Your Honor.

And I'm not saying that Mr. Friedman made any promises. I'm just saying that that's why I brought up the stipulation to begin with.

As far as the threat -- I do think it's telling that the government is leading with the charges here.  But there are people who are in jail for murder, for murdering witnesses or paying people to murder witnesses, and they're still allowed to

1    have money in their commissary account.

2        Again, we're not talking about a substantial amount of

3    money.  We're just talking about enough for her to support

4    herself in a manner which every other individual has a right to

5    do.

6        As far as presenting the money at trial, again, we're

7    willing to stipulate to anything.  So if Mr. Friedman wants to

8    show paper dollars, then we're willing to -- I'm willing to

9    promise him that Mr. Bos will loan Mr. Friedman that money and

10   he can show those paper dollars and we will stipulate that

11   that's the same amount of money, if he thinks that will be more

12   effective.

13       Whatever the government wants to do is fine.  We're really

14   just here about getting Ms. Ferrier the ability to get all of

15   the shampoo she wants, get all the toiletries that she wants,

16   get all the under things that she wants, and to be able to

17   communicate with her family, which is more expensive, obviously,

18   because they're in Canada.

19       So that's all we are looking to do.  Again, if it's an

20   additional burden on the government, I can file a status report

21   every three weeks saying the amount of money that Ms. Ferrier

22   has on her commissary account according to the DOC, and I can

23   work with Mr. Friedman's paralegal to release small amounts of

24   money so that any concerns that the government might have about

25   security risks are addressed.

1        But I don't think that that's actually a legitimate reason

2   to withhold her property.  If I wanted to, I could deposit $100

3   in Ms. Ferrier's account right now, and those risks will still

4   remain.  It's really just about whether the government --

5            MR. FRIEDMAN:  Mr. Ohm or another friend or family

6   member could do that, just not using the money that's evidence

7   in this case, important evidence.

8            THE COURT:  Mr. Ohm, I think the law's on the

9   government's side here.  While I do appreciate your points about

10  the toiletries and the like, I think part of the reason why

11  we're in the situation we're in is the continued threats that

12  have occurred from the jail.  I think that's what makes this

13  particularly difficult to release the money.

14       So given, you know -- having reviewed the briefs, I am

15  going to deny Ms. Ferrier's motion for the return of property.

16  She is charged with three federal criminal offenses:

17  Threatening to kill and injure the President of the United

18  States, threats to interstate commerce, and prohibitions with

19  respect to biological weapons.

20       These charges stem from Ms. Ferrier's actions in September

21  2020 when she allegedly sent threatening letters from Canada to

22  the United States containing the toxic poison ricin.  These

23  letters were addressed to the President of the United States at

24  the White House and the eight government officials in Texas.

25       On September 20, 2020, she drove her car from Canada to the

Peace Bridge border crossing in Buffalo, New York, in the Western District of New York.  She was stopped by a Customs and Border Control agent who asked if she was okay.  She replied she was wanted by the FBI for the ricin letters.  Among the items seized from her car that day was U.S. currency in the amount of $2,296.35.

She now seeks a return of the property.

The Court will deny the motion.  Under Federal Rule of Criminal Procedure 41(g), a person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return.  It also specifies that the motion must be filed in the district where the property is seized.

Ms. Ferrier's property was seized in the Western District of New York.  Accordingly, the District Court for the District of Columbia is not the appropriate venue for the filing of this motion.  *United States v. Bailey*, 209 F.Supp.3d, 55 at 59, Note 1.  That's a D.D.C. case, 2016.

In addition, courts may rightfully refuse to return claimed property when the property involved is subject to government retention pending termination of trial.  *U.S. v. Farrell*, 606 F.2d, 1341 at 1347.  That's a D.C. Circuit case.  The property should not be returned if it is still needed as evidence.

The government asserts that it needs the currency as evidence in two pending proceedings, the one before this court

and one in the Southern District of Texas.  The government
explained that the ricin letters at issue in these cases
contained threats to take violent action in the future, and the
currency may be used as evidence to prove her intent to purchase
contraband without trace in order to carry out those threats.

The government also argues the currency may be relevant
evidence in other respects, including to prove her identity,
mental state, and motive.

The Court finds, therefore, the government has satisfied
its burden to show the property is relevant evidence in an
ongoing proceeding, and the government's interest in holding the
property, particularly considering all the reasons stated under
seal, I believe its reasons are stronger than Ms. Ferrier's
interest in the property loss, including her interest in having
toiletries and the like at D.C. Jail.

I think the government has proffered compelling evidence
that returning the money at this time could result in serious
threats to public safety.  Again, that's *in re Smith*, 888 F.2d
at 168, a D.C. Circuit case.

So for all these reasons, I will deny the motion.

Next, turning to the government's motion for competency
exam, I don't know if Mr. Ohm or Mr. Bos is going to address
this.  But Mr. Ohm, you have become, at least before me, quite
the expert on competency matters.  So I will direct this at you,
but feel free to jump in, Mr. Bos.

1          MR. BOS:  Your Honor, I'm going to be handling this.

2     If Mr. Ohm has any tidbits to add --

3          THE COURT:  He is well-versed in this statute.

4          MR. OHM:  Mr. Bos was the lawyer on *Gamarra*, Your

5     Honor.

6          THE COURT:  So you've been leaning on him as you file

7     all these briefs.  Okay.

8       All right, Mr. Bos.  Maybe you should join Mr. Ohm next

9     week in the Carter case.

10         MR. BOS:  Trust me, Your Honor, I have more than

11    enough work to do.

12         THE COURT:  All right.  Looking at 4241, it looks like

13    the government -- it does seem on the record here that there's

14    reasonable cause to believe that Ms. Ferrier may presently be

15    suffering from a mental disease or defect, and it's just

16    reasonable cause.  It's not any finding.  And it seems as

17    though, on the government's motion where there's ample evidence

18    based on her behavior at the time she was arrested and

19    subsequent evidence, there is a reasonable cause here.

20      I don't understand why I shouldn't grant this motion.  It

21    seems pretty straightforward.  The next decision may be

22    difficult, but it seems like this one is kind of a no-brainer.

23         MR. BOS:  So, Your Honor, I guess this is why we have

24    these hearings.  I think it's a no-brainer in the other

25    direction.  As I was forcefully reminded by, I believe it was,

1   Dr. Teegarden, who used to be the evaluator for D.C. Superior

2   Court before Dr. Grant came along, is there is a distinction

3   between potentially suffering from a mental illness and a

4   competency inquiry.  The competency inquiry is whether or not

5   the defendant presently doesn't understand the nature of the

6   proceedings or the consequences of the proceedings or able to

7   properly assist her defense.

8        And the government hasn't put forth any evidence that she

9   doesn't understand the nature of these proceedings and that she

10  doesn't understand or is not able to assist us in our defense of

11  Ms. Ferrier.

12       Your Honor, you could be actively, you know, suffering from

13  a very severe mental illness and still be competent to proceed

14  to trial.  And at best, what the government presents to the

15  Court on the record, and we will take the government's

16  allegations on their papers, even in the best light of the

17  government, is that she's engaged in continuing criminal

18  conduct, not that she doesn't understand the nature of the

19  proceedings or the consequences of the proceedings against her.

20       And as we note in our pleadings, every time that she has

21  been before a court and concerning the nature and the

22  consequences of the proceeding, she has demonstrated that she

23  fully understands the nature of the proceedings.  She's waived

24  such important rights as a right to a preliminary hearing, right

25  to an identity hearing, rights to assert her speedy trial, all

1   of those without any incidents at all.  There's no question

2   about not understanding the nature of these proceedings.

3       And these are complex hearings when we're dealing with

4   issues about speedy trial and what type of exclusions that can

5   happen.  A identity hearing, I think most lawyers don't

6   understand identity hearings when they first come to federal

7   court.  And so there's just nothing there.

8       And the reason why I raise that, Your Honor -- and again,

9   we're here on the government's motion, and I guess in theory

10  Mr. Friedman should be making the arguments first to the Court.

11          THE COURT:  I will give you a chance to respond.  I

12  just wanted to start with you because it seemed like under the

13  plain language here.  I get your argument, but -- and certainly,

14  your view of her ability to understand the proceedings is an

15  important factor the Court should consider.

16      Nonetheless, even though these proceedings, all of which

17  before me have been conducted over Zoom, there haven't been any

18  noticeable outbursts or reasons to think that she's not

19  following what's going on, although there were problems in the

20  beginning with the interpreter.  I don't think that's an issue

21  that informs the decision on this motion at all.

22      Certainly, her conduct while she's been detained is

23  disturbing, and whether she appreciates the consequences of her

24  actions, you know, attempting to shove officers, throwing liquid

25  substances at officers, refusing to open her mouth, refusing to

1    obey orders of officers, all of that suggests some disconnect.

2    That's not normal behavior, even for someone who has continued

3    intent to commit additional criminal conduct.  That seems off to

4    the Court.

5            MR. BOS:  So let me respond to that, Your Honor,

6    because the conduct of and the conditions at Northern Neck

7    Regional Jail is quite ripe with me right now because I have a

8    client right now who I think actually may be going in the other

9    direction than Ms. Ferrier is concerned as far as his mental

10   health because of the conditions down there.

11         Your Honor, what we're talking about -- well, as far as we

12   know -- well, and I'm not suggesting that there might be things

13   that we don't know.  Ms. Ferrier has been in three facilities

14   during the pendency of this case, one up in New York, Northern

15   Neck Regional Jail, and now the Correctional Treatment Facility.

16   And the only place where she had issues -- and again, issues

17   that are as run-of-the-mill as (distorted audio) such as

18   disobeying, quote unquote, orders by the staff.  All of those --

19   again, I don't want to raise much more, but, you know, failure

20   to comply with opening her door, all occurred down at the

21   Northern Neck Regional Jail.  And there haven't been any

22   compliance problems since she's been at the Correctional

23   Treatment Facility, and there were no compliance problems

24   reported when she was up in New York that we're aware of.  And

25   certainly, if the government has that information, they can come

1   forward with it.

2       But Your Honor, I do not think that that comes anywhere

3   close to rising to the level that she doesn't understand the

4   nature of the proceedings.

5       Let me just -- and to the issue of continuing to engage in

6   potentially criminal conduct, first of all, we're not conceding

7   any of the allegations at this point.

8           THE COURT:  Of course.

9           MR. BOS:  But for the purpose of this or the purpose

10  of this argument, Your Honor, we would say look, Judge, if

11  somebody stabbed another inmate while they were locked up, if

12  somebody tried to bribe a guard in order for them to be able to

13  get out, if somebody actually tried to escape themselves, that's

14  not considered bizarre conduct that would say that you're not

15  competent to understand the proceedings.  That's probably just

16  the opposite with the escape perspective because you know that

17  the results could be quite serious and it could result in the

18  depravation of your liberty.

19      So, Your Honor, I understand that the reasonable cause is a

20  low bar, but Your Honor, the reason why I think this doesn't

21  even meet that bar is, as the Court probably knows at this

22  point, the usual process is before we go to a full commitment

23  under 4241(a) there's first a 24-hour evaluation that should be

24  done by Dr. Grant.  And most -- oftentimes, I don't take a

25  position on that.  Oftentimes -- and the reason for that is

1    because I can't figure out what my client's position should be.

2        That is not this case.  Not only do I not think that a

3    commitment under 4241(a) is appropriate, I don't think that even

4    the 24-hour evaluation by Dr. Grant would be appropriate.

5        Again, Your Honor, remember what the government is asking

6    the Court to do, to remove Ms. Ferrier from this jurisdiction

7    for who knows how long.  I am guessing from your comments to

8    Mr. Ohm that you have some familiarity with what happens when we

9    send people away for evaluations or restorations.  The statute

10   requires 30 days.  It's never complied with by the marshals or

11   by the government.

12       And Your Honor, before you make that decision to send her

13   out of this jurisdiction under 4241(a) evaluation, the Court

14   should at least consider -- we don't think the Court should even

15   consider the 24-hour evaluation by Dr. Grant.  That is a step

16   that the Court should at least take before it goes forward, if

17   it's going to go forward, with the 4241(a).

18           THE COURT:  And the 24-hour evaluation is typically

19   done on-site?

20           MR. BOS:  So my understanding now, having been dealing

21   with Dr. Grant for a number of years, is that she's doing them

22   by video.  Normally what would happen in the days before COVID,

23   that the client would be brought down to D.C. Superior Court,

24   and an evaluation would be done then.  I will tell the Court

25   right now that I am sure, knowing Dr. Grant's position, that she

1    would not be able to get it done in the next 24 hours, and we

2    wouldn't be insisting on that, that we would allow additional

3    time.

4        But this is premature to go through a full 4241 30-day

5    evaluation.

6        THE COURT:  All right.  So let me hear from you,

7    Mr. Friedman.  If you could start by addressing where

8    Ms. Ferrier would be taken for this evaluation.

9        As you'll understand from some of your colleagues, the case

10    I referenced with Mr. Ohm earlier, the Carter case, I do take

11    these deadlines in the statute quite seriously.

12        Are you telling me that you're going to be able to complete

13    this in 30 days, or are you going to be coming back and saying

14    we need more time?

15        And if so, looking at the plain language, I don't see where

16    you get more time.  Maybe there are cases interpreting this

17    provision that say you do, but it's pretty clear that this is

18    for a period not to exceed 30 days.

19        So can the government even accomplish this in the next 30

20    days if I were to grant the motion?

21        MR. FRIEDMAN:  Your Honor, I know I've handled other

22    criminal cases where the Bureau of Prisons has been able to

23    complete its competency examination and prepare the report

24    within 30 days.  I've seen a number of cases where the facility

25    asks for an additional 15 days, which is permitted by the terms

1    of the statute.  There's a clause that allows for an extension

2    of up to 15 more days.

3        And so, you know, obviously, I'm just the lawyer in

4    Washington, D.C.  So I can't, you know, know what's going to

5    happen.  But --

6        THE COURT:  Where would she be taken?  Is this a

7    transport to Butner kind of thing, or is this a local

8    evaluation?

9        MR. FRIEDMAN:  Yes, I think it would be in a Bureau of

10   Prisons facility.  So it could be in Butner.  It could be at the

11   other facilities.

12       THE COURT:  I've got another defendant, this is the

13   one I'm referring to, that -- how long has he been waiting,

14   Mr. Ohm, at this point?

15       MR. OHM:  Since September 1st, Your Honor.

16       THE COURT:  Like how is this realistic to even suggest

17   this is going to happen at this point?

18       MR. FRIEDMAN:  Well, it could be that the pandemic has

19   caused some delays in cases.  Where I have experience, it

20   occurred before the pandemic.

21       It could be that there's ways to do it at the D.C. Jail or

22   at CTF.  But we're loathe to -- the 24-hour review we don't

23   think would be sufficient, you know.  Mental illness is an

24   incredibly challenging area.  Anyone who knows someone or who

25   has a friend or family with mental illness, which is purely to

1    say all of us, knows how challenging this is.

2          Your Honor, we didn't rush into the filing of this motion

3    for a competency exam.  This is not a case where someone got

4    arrested and we're showing up at the detention hearing

5    requesting that the defendant be shipped away for a 30-day

6    evaluation.  These are facts that have been developing over a

7    long period of time.

8          We did provide to the Court as one of our exhibits, I think

9    it was Exhibit I, disciplinary reports from the New York

10   facility where the defendant was held when she was first

11   arrested in September and October of 2020.  We provided

12   disciplinary reports from the Northern Neck Regional Jail as

13   well and the phone calls.

14         And when you consider all of those things, the defendant's

15   conduct, the bizarre conduct that she's charged with in the

16   first place, and then you consider what's in our sealed filing,

17   the material that came through the various exhibits from the

18   sealed filing, I think any reasonable person who has experience

19   with human beings will see that this is someone who is giving

20   all signs of not fully understanding what's going on due to a

21   mental illness.  All of the indications are there.

22         We particularly draw Your Honor's attention to the

23   materials that we submitted under seal.  And these are -- the

24   sealed items are in the context of an individual who is

25   currently detained pending trial, charged in two different

1    jurisdictions with nine life-sentence eligible criminal

2    offenses.  And this is an individual who is, I believe, 56 or

3    maybe 57 years old.

4         So, you know, you're looking at someone who is in a world

5    of legal trouble due to the criminal charges that she's facing,

6    and then when you see the conduct that she's engaged in during

7    this time period.  It really raises -- it does raise grave

8    competency concerns.

9         And whichever direction this case goes, those concerns are

10   going to be there.  If we end up having a trial in this case

11   here in D.C., there's going to come a time where we're going to

12   have to address whether this case can proceed to trial or not.

13        And without a significant -- and if there's going to be a

14   plea agreement, which Mr. Bos and I and Mr. Ohm and I have had

15   some discussions about that, in my impression those discussions

16   probably should continue.  We haven't been able to have a lot of

17   detailed discussions, but they may continue.  Hopefully, they

18   will.  And if it goes that direction, there's going to have to

19   be statements made by the attorneys and a decision made by the

20   judge about whether the defendant is competent.

21        And, Your Honor, the parties, the attorneys and Your Honor

22   currently have so little real usable evidence and information to

23   be able to evaluate what is going on here.  We think it's so

24   important that there be this 30-day examination so that Your

25   Honor can have an idea of whether -- how significant the

competency issues are, whether she is competent, and which way this case should go moving forward.

THE COURT:  All right.  Thank you, Mr. Friedman.

Mr. Bos, if you want to address the issues in the New York facility, as well as Northern Neck.  I have a number of defendants in Northern Neck as well.  I'm not hearing that they're reacting in this way.  This is -- as you've acknowledged, this is a low threshold for this reasonable competency determination.

And I will tell you, I was inclined to grant the motion. My hesitancy right now is the timing issue.  And so I'm going to probably ask Mr. Friedman to get back to me on that before I do this.

But go ahead and address anything you want in response to what he said.  But just so you know how I'm leaning, that's where I am.

MR. BOS:  Thank you, Your Honor.

Your Honor, I think that while it is a lower threshold than proof beyond a reasonable doubt, it is a threshold that has to be met under the legal structure, and the legal structure couldn't be more clear in the statute and in the case law, is whether or not she understands the nature and consequences of the proceedings, one, and two, can she assist properly in her defense.

And the government hasn't put forth any evidence to suggest

that she doesn't understand the nature of the proceedings here.

THE COURT:  To be fair, Mr. Bos, the only access they have is what they see here and then what her behavior is at the time she was arrested and in prison.

MR. BOS:  At the time of her arrest in the Western District of New York, she turned herself in because she believed that she was facing charges in the United States.  That's the evidence that we have here.

THE COURT:  But the behavior was very odd.  "How are you doing?  I'm wanted by the FBI."  That's not what normally one says.

MR. BOS:  Well, if somebody is trying to turn themselves in because they believe there might be a warrant out for their arrest, that's precisely what they would do, that they would go into a police station and say, "I believe that there's a warrant outstanding for my arrest.  I want to turn myself in."

In fact, I repeatedly advise clients to do just that because then we have a better chance of getting them out, that if you know that you have a pending criminal charge, that you act accordingly.

THE COURT:  But her behavior since then isn't consistent with that interpretation, that she was just turning herself in to accept responsibility and be done with her criminal behavior.

MR. BOS:  No, no, I don't tell my clients that they're

turning themselves in to accept responsibility.  I'm telling my
clients, if you turn yourself in, then there's a fair chance we
can get you out, and then perhaps we will have a better chance
as we go forward --

THE COURT:  My only point is her conduct since the
time at the border isn't consistent with one who just wants to
make things right with law enforcement.

MR. BOS:  No, I'm not saying that.  Your Honor, she
could and very well at this point we're taking the position she
wants to clear her name.

THE COURT:  It's not consistent behavior, I guess, is
my point, if I take your interpretation of what she did at the
border.

MR. BOS:  I'm sorry, Your Honor.  I guess probably I
wasn't as clear as I probably should have been.  By turning
herself in to the police, she is trying to get this situation
resolved.  She's not trying to evade the police or anything like
that.  Resolving could be I want to clear my name, not
necessarily I don't believe that the allegations are true, or if
it comes to it, if we have to engage in plea negotiations, maybe
a more favorable plea if she turned herself in, that there are
all sorts of reasons why she would engage in that conduct,
separate and apart from whether or not she understands the
nature of the proceeding.

So her conduct after she turned herself in to the police

1    is -- again, someone trying to escape from jail, right, or

2    trying to evade continued detention, that's a rational decision.

3    Right?  Especially if -- if when you turn yourself in you say

4    okay, they've got no case against me, then you find out they do

5    have a case against me, a rational person might say, boy, I

6    better high-tail it out of here and do whatever I can.

7        You can't conflate criminal conduct with someone saying

8    that they don't understand the nature of the proceedings.

9        THE COURT:  But a rational person wouldn't continue

10   with the same type of behavior, one would think.

11       MR. BOS:  So we have one instance in January of this

12   year -- I guess of last year, a year ago where she reportedly

13   wrote these letters.  Nothing since then.

14       And again, the issue is whether or not she presently

15   doesn't understand the nature of the proceedings or is presently

16   unable to assist counsel, and there's certainly nothing that

17   suggests that.  The government hasn't even put forth anything,

18   any conduct she's engaged in in the last six months.

19       But I understand the other issue that the Court is

20   concerned about.  I am concerned as well.  And I think -- and

21   this is as far as the timing is concerned.  I don't know what

22   the facts are in the Carter case.  So let me just give you a

23   quick little example of what happened in the *Gamarra* case.

24       Mr. Gamarra, after the Court ordered the evaluation, sat,

25   not surprisingly, at Northern Neck Regional Jail for over six

weeks before they even transferred him.

THE COURT:  We've got longer in the other case.  So I'm familiar with this problem.  That's why I am -- Mr. Friedman, I'm not going to -- while I'm inclined to grant the motion, I do need to know how realistic it is that the government would actually be able to implement the order within 45 days.

MR. BOS:  Your Honor, I'm sorry.  Just one other line I wanted to raise for the Court and another reason why the Court shouldn't do it, from our perspective, is that the Bureau of Prisons takes a different position than the U.S. Attorney's Office here as to when that 30 days starts.

THE COURT:  Yeah, I know.  I don't take the view -- and Mr. Friedman, you can learn more about my position from the Carter case if you're interested, but I don't take the view that once an order is implemented a defendant is in this limbo state where the clock doesn't start ticking until they're in the hospital.

So it's -- I haven't faced this particular provision, but with respect to the other portion of the statute, it seems like these deadlines are firm, and there's not a no man's land where a defendant can just be held endlessly waiting for transportation.

So what I would like to do is -- how much time, Mr. Friedman, do you think you need to be able to give me some

1    sense of whether this is realistic, that this could be

2    accomplished within 45 days?  I appreciate you're not the

3    marshals, you're not the Bureau of Prisons, but you're all one

4    Department of Justice here.  So I would like some sense from

5    what you're able to determine about how likely this could be

6    done in the next 45 days.

7          I'm really hesitant to, in the middle of a pandemic, send a

8    defendant to Butner to sit there for months and months.

9          MR. BOS:  Your Honor, can I also throw one other

10   wrench in the works on this that I think should be considered?

11   Does your other case also involve a female detainee?

12         THE COURT:  No.

13         MR. BOS:  I think she would go down to Texas, to

14   Carswell, Texas.

15         THE COURT:  Well, that might be better.  I don't know.

16   In terms of backlog.  I have no idea.

17         Mr. Friedman, not to jam you, but how long do you think you

18   would need to give me some sort of, you know, status report or

19   supplemental briefing that would just give me some assurance

20   that this would be done in a timely fashion if I were to order

21   it?

22         Is he frozen?

23         MR. FRIEDMAN:  Sorry.  Could we file something -- if I

24   could take a couple days to investigate and we could file

25   something perhaps on Wednesday of next week?

1          THE COURT:  That's fine.  I will give you up to -- on

2    or before the 14th.  How about that?  I want to give you plenty

3    of time.  Is that adequate?

4          MR. FRIEDMAN:  Yes.

5          THE COURT:  Okay.  So I will defer any ruling on this.

6    And depending on what the government files -- to the extent the

7    defense wants to file anything in response to that, I will give

8    you a few days as well.  But to the extent I need to hear from

9    the parties more, I will have Mr. Hopkins get in touch with you

10   to arrange a hearing to follow up with any additional questions

11   I might have from those filings.

12       So I will give the government until the 14th, and Mr. Ohm

13   and Mr. Bos, to the extent you want to file anything in

14   response, does the 19th give you adequate time?

15         MR. BOS:  That's fine, Your Honor.

16         THE COURT:  All right.  So anything else we need to

17   address today in terms of discovery or any other issues?

18         MR. BOS:  Do you want to set a control date or

19   anything like that?

20         THE COURT:  I do.  I just wanted to know whether there

21   are other issues other than those two motions we needed to deal

22   with.

23         MR. FRIEDMAN:  We've been continuing to produce

24   discovery.  We made a couple of discovery productions recently.

25   And we're gathering more and will continue making productions to

1      Mr. Bos and Mr. Ohm.

2                  THE COURT:  Okay.

3                  MR. OHM:  One thing that I think, perhaps, the Court

4      should know, though, is that we've had a horrendous time trying

5      to get electronic discovery to Ms. Ferrier at the jail.  We

6      submitted a disk back in August for her.  They had told us it

7      was about a 30- to 60-day wait.  She still hasn't received them.

8      I guess we got nonresponsive responses periodically up until

9      yesterday where they said that if we brought another copy of the

10     disk on Tuesday, she should have a laptop next week.

11         In case there are more problems, I wanted to let the Court

12     know.

13                 THE COURT:  I would be happy to do my best to

14     facilitate that, Mr. Ohm.  So if this latest promise isn't met,

15     can you let me know and give me some history, and I will do what

16     I can.

17                 MR. OHM:  Certainly.  Will do.  Thank you, Your Honor.

18                 THE COURT:  So in terms of future hearing, let's

19     assume for a moment that there's no need to have a follow-up

20     hearing on the pending motion, on the 4241 motion.  What would

21     the parties suggest in terms of a next date?

22         Clearly, if Ms. Ferrier is going somewhere for an

23     examination, that will delay things, but let's proceed as though

24     that's not happening.  What would the parties' recommendation be

25     in terms of a next court date?

1          MR. BOS:  Your Honor, I would think maybe we come back

2     in about 30 days or so.  Does that --

3          THE COURT:  Mr. Friedman?

4          MR. FRIEDMAN:  Yes.

5          THE COURT:  Okay.  All right.  So let's look at the

6     first week of February.  I'm fairly available.

7          MR. BOS:  Is that the first full week, Your Honor?

8          THE COURT:  No, no.  The 1st, 2nd -- well, the 2nd is

9     not good.  The 1st or the 4th, would that work for you all?

10         MR. FRIEDMAN:  Yes.

11         MR. BOS:  Your Honor, I can do the 1st, if that's

12    available.

13         THE COURT:  Okay.  How does 2:00 p.m. on February 1st

14    work for the government?

15         MR. FRIEDMAN:  Yes.

16         THE COURT:  Okay.  All right.

17         COURTROOM DEPUTY:  Your Honor, that might not work for

18    D.C. Jail.  We might have to do 3:00.

19         THE COURT:  Okay.  That works for me at least.  Does

20    that work, Mr. Friedman, Mr. Bos, Mr. Ohm?

21         MR. BOS:  Your Honor, I can do 3:00, but I don't know

22    what Ms. Ferrier's position is going to be as far as whether or

23    not she would want to appear in person.

24         THE COURT:  Okay.  Well, I can just tell you, if we're

25    anything like we are right now, I'm not -- I don't think she has

1   the right to appear for just a standard status conference

2   hearing under the CARES Act.  I don't think I need her consent

3   to do that by video conference.  And if we're in the situation

4   we're in right now, then I'm not going to do that because we're

5   discouraged from having in-person hearings.  Normally, I would

6   be very receptive to that, but not where we are right now.

7           MR. BOS:  Your Honor, the only reason I raise it is if

8   hopefully this omicron surge is like it's in South Africa and

9   other places where it could be abating early February, it might

10  make more sense to set it down a little bit later in February.

11      Why don't we set it on the 3rd.  If it works at 3:00 for

12  everybody --

13          THE COURT:  Let's do that.  And the presumption will

14  be this is by video conference, but if things change

15  dramatically, I would be open to an in-person hearing.  But you

16  can reach out to Mr. Hopkins in advance of that, because he

17  would need time to do that.  At this point I just don't think

18  it's wise to be talking about in-person hearings, given the

19  state we're in right now.

20      All right.  So any objection to me excluding time from now

21  until February 1st in calculating the date for speedy trial?

22          MR. BOS:  No, Your Honor.

23          THE COURT:  I do believe it's in the interest of

24  justice to exclude this time in calculating the date for speedy

25  trial.  I know the defense is having issues reviewing the

1   discovery with Ms. Ferrier, and there are pending motions and

2   decisions that the defense needs to make about how best to

3   defend this case.  So I will exclude that time, and I will see

4   you back on February 1st.  If there's a need for a hearing

5   sooner than that, I will have Mr. Hopkins let you know.

6           MR. FRIEDMAN:  Yes, Your Honor.

7           MR. BOS:  Could we have a quick breakout room once we

8   get done?

9           THE COURT:  Sure.

10      All right, Ms. Ferrier.  I will see you back on

11  February 1st, if not before.

12          THE DEFENDANT:  Okay.

13          THE COURT:  Thank you.

14      (Proceedings adjourned at 12:08 p.m.)

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Sara A. Wick, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7          Please Note:  This hearing occurred during the

8    COVID-19 pandemic and is, therefore, subject to the

9    technological limitations of court reporting remotely.

10

11

12   /s/ Sara A. Wick                    May 2, 2022

13   SIGNATURE OF COURT REPORTER         DATE

14

15

16

17

18

19

20

21

22

23

24

25