**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA :**

    **v.**     **:**    **20-cr-202 (DLF)**

**PASCALE FERRIER**    **:**

## DEFENDANT'S SENTENCING MEMORANDUM

Ms. Pascale Ferrier will appear before this Honorable Court for sentencing on May 31, 2023 after pleading guilty on January 24, 2023. She pleaded guilty to the most severe count (count 3) of the Superseding indictment in this case, as well as counts one through eight in Case No. 20-cr-861 arising out of the Southern District of Texas. Ms. Ferrier has been in continuous custody since September 20, 2020, when she was arrested by Customs and Border Patrol agency knowing she was wanted for sending the letters that were discovered two days earlier on September 18, 2020. The Texas conduct to which she pleaded guilty occurred between September 14, 2020 and September 21, 2020, according to that indictment.

After her arrest, Ms. Ferrier was detained in Buffalo, NY then transferred to Washington D.C. via Ohio, and she arrived for initial appearance on November 4, 2020. The vast majority of her time incarcerated has been during the worst parts of the COVID-19 pandemic where individuals were largely relegated to their cells. When programming recommenced, Ms. Ferrier enthusiastically participated, and she became a valued contributor in the classroom and an exceptional student in the Georgetown Scholars program.

The parties urge this Court to accept the agreed-upon sentence, not only because of it

1

reflects the appropriate sentence for such cases, but also because such a sentence would be sufficient but not greater than necessary.  Ms. Ferrier has ~~also~~ consented to her removal from the United States – a decision which will eliminate participation in certain programming such as halfway house credit time and good time credit, as calculated by the Bureau of Prisons, adding additional time to her sentence.  Ms. Ferrier pleaded guilty without any assurances that she wouldn't be prosecuted in Canada for the conduct to which she admitted – that is the manufacturing of a prohibited substance.

Finally, Ms. Ferrier has been interested in pleading guilty since the inception of this case, and the long delay before her guilty plea was the result of Covid, changes in defense counsel as well as the difficult legal issues presented by this case.

The parties and U.S. Probation have concluded that the appropriate sentence for Ms. Ferrier is a sentence of 262 months of incarceration, nearly 22 years.  Such a sentence would not only avoid creating an unwarranted sentencing disparity, it will aptly reflect Ms. Ferrier's history and characteristics, most notably, her lack of criminal record, her age, and her close ties to her family, her acceptance of responsibility, and her attempts to improve herself while incarcerated. Respectfully, this Court should impose the 262 month sentence.

## Introduction

Ms. Ferrier was born and raised in France where she lived ~~there~~ until she immigrated to Canada in 2008. Before she left France, she studied engineering and received a degree in 1993. She gave birth to her two children in France, Laura in 1994 and Nicolas in 1995.  In 1998, she split with the children's father, and she began working to support her family as a single mother. She worked as a software developer from 1998 until she left France for Canada in 2008 with her teenaged children.

2

Ms. Ferrier has always been employed, usually in her computer-related fields of software or web development.  When she was unable to find work, Ms. Ferrier worked as a cashier and laborer for minimum wage until she was able to secure employment in her field. Throughout this time her family has since grown, but because of her incarceration, Ms. Ferrier has missed out on the joys of being a grandparent.  She has four granddaughters, the oldest of whom just turned three years old.

## Argument

### Sentencing Law

Twenty years ago, the Supreme Court held that "the Federal Sentencing Reform Act of 1984…ma[de] the Guidelines effectively *advisory*."  *United States v. Booker*, 543 U.S. 220, 245 (2005).  Under *Booker*, the "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing. " *Id.* at 264 (citing *See* 18 U.S.C. §§ 3553(a)(4), (5)).  While holding that district courts should still consider the Guideline calculations and ranges for sentencing purposes, the Supreme Court in *Booker* held that courts must consider all the purposes of sentencing set forth in 18 U.S.C. § 3553(a).   Overall, in light of *Booker*, courts must treat the Guidelines as one among several of the sentencing factors.

Pursuant to 18 U.S.C. § 3553(a) – as explicitly endorsed by the Supreme Court in *Booker* – sentencing courts should consider the need for the sentence imposed:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with the needed educational and vocational training, medical care, or other correctional

treatment in the most effective manner

Several years after *Booker*, the Supreme Court made clear that the "Court's overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'" *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)), to comply with "the four identified purposes of sentencing:  just punishment, deterrence, protection of the public, and rehabilitation," *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also* 18 U.S.C. § 3553(a)(2).

In determining such a sentence, the sentencing court must consider the United States Sentencing Guidelines, the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed to serve the purposes of sentencing, the kinds of sentences available, the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offense.  *Id*. § 3553(a)(1).  In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, mental and emotional conditions, and lack of guidance as a youth.  *Id.* § 3661.

Congress has further provided that:

[t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.

18 U.S.C. § 3582(a).  With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]."  *Id*. § 3553(a) (emphasis added).

Since *Booker*, the Supreme Court reaffirmed that the Sentencing Guidelines are merely one

factor to be considered by district courts when fashioning a reasonable sentence and that the
Sentencing Guidelines are not to be weighed more heavily than other sentencing factors. *See Rita
v. United States*, 551 U.S. 338 (2007); *Gall v. United States*, 552 U.S. 38 (2007).  A sentencing
court shall not simply presume that a sentence within the Guideline range is automatically
reasonable or that a sentence within the Guideline range is more reasonable than a sentence outside
of the Guideline range. *Rita*, 551 U.S. at 338; *Gall*, 552 U.S. at 46. The sentencing court further
shall not presume that a sentence outside of the Guidelines range is unreasonable.  *Id.*  By
considering the Sentencing Guidelines along with all of the factors set forth 18 U.S.C. § 3553(a),
"the sentencing court subjects the defendant's sentence to the thorough adversarial testing
contemplated by federal sentencing procedure." *Rita*, 551 U.S. at 351.  It is critical for
sentencing courts to consider all sentencing factors and to not give undue weight to the
Sentencing Guidelines because, as the Supreme Court has long emphasized that "'[i]t has been
uniform and constant in the federal judicial tradition for the sentencing judge to consider every
convicted person as an individual and every case as a unique study in the human failings that
sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" *Gall*, 552
U.S. at 52 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)); s*ee also United States v.
Faison*, No. GJH-19-27, 2020 U.S. Dist. LEXIS 27643, at *4-5 (D. Md. Feb. 18, 2020)("But if
judges are not careful, a rote application of the Guidelines can turn what is often a life-defining
moment for the defendant into a check-the-box, formulaic calculation devoid of the
individualized sentencing we strive for.").

     I.     The  Guidelines calculations

     Ms. Ferrier objects to the enhancements under USSG §3A1.4 (federal crime of terrorism)
and USSG §2M6.1(b)(3) (substantial disruption enhancement).  Ms. Ferrier also objects to the

elevation of her criminal history category to VI.  Ms. Ferrier thus contends that her Offense

Level should be 35 and her Criminal History Category should be I, a range of 168-210 months.

    A.  USSG §3A1.4

    The Guidelines provide for a 12 level increase for a felony that involves or is intended to

promote a "federal crime of terrorism."  The definition of "federal crime of terrorism," as

referenced in the Application Notes, is contained in 18 U.S.C. §2332b(g)(5), in pertinent part, an

offense that is "calculated to influence or affect the conduct of government by intimidation or

coercion, or to retaliate against government conduct" and is a violation of an enumerated offense.

"The definition is stated in the conjunctive, so both requirements must be met."  *United States v.*

*Parr*, 545 F.3d 491, 503-04 (7th Cir. 2008).  The conduct here was calculated to influence or

affect a person – that is, Donald Trump, but not government conduct.  The enhancement should

not apply.

    Absent from the record is any evidence of what Ms. Ferrier's specific intent was.  As the

United States recently conceded in the Ninth Circuit (and as other circuits have agreed), the

terrorism enhancement requires a specific intent.  *United States v. Alhaggagi*, 978 F.3d 693, 699-

700 (9th Cir. 2020).  The Circuit notes an important distinction between the terrorism

enhancement and the substantive crime under 18 U.S.C.§2339B(a)(1), that is, the enhancement

"requires the defendant's specific intent that the offense 'influence or affect the conduct of

government by intimidation or coercion.'"  *Id.* at 701.  Significantly, *Alhaggagi* also holds that in

cases that do not involve "violent terrorist acts" "evidence beyond facts underlying the offense

conduct must reflect that the defendant had the enhancement's requisite intent."  The letter

addressed to Donald Trump has no mention of the U.S. government or government policies.  The

letter very specifically seeks to influence Donald Trump from running for reelection. Like the

other letters, this message is calculated to address Donald Trump the man and not Donald Trump

the president.  Notably, the envelope is addressed to Donald J. Trump and not President Donald

Trump.  There is no mention of United States domestic or foreign policy anywhere in the letter

(as compared to Shannon Richardson who was targeting gun control in her ricin letters).

   Ms. Ferrier's complete letter states:

   Hello,

         I found a new name for you:

               "The Ugly Tyrant Clown"

         I hope you like it.

         You ruin USA and lead them to disaster.  I have US cousins, then I don't

   want the next 4 years with you as president.  Give up and remove your application

   for this election.

         So I made a "special gift" for you to help you to make a decision.  This

   gift is in this letter.

         If it doesn't work, I'll find a better recipe for another poison, or I might

   use my gun when I'll be able to come.

         Enjoy!

         <u>Free Rebel Spirit.</u>

   ECF No 5-1.

   To the extent that the prosecution would argue that use of the word "Tyrant"

demonstrates intent or "calculate[ion]" to influence the government, the Texas letters reveal that

is false.  The Texas letters refer to correctional staff as the "tyrants of the jail's Dictatorship" –

those letters very clearly relate to a particular grievance on a personal level.  One individual was

told she was a "bad C.O." Texas Plea Agreement at 9.  Two others reference the loss or inmate

property.  *Id.* at 10.  Yet another refer to the officers as "liars and thieves."  *Id.* at 11.

In other words, each of the letters were "calculated" to express a grievance at a person,

including the one addressed to Donald Trump. To the extent that the letter to Mr. Trump was

also calculated to dissuade him from running for reelection, that still does not qualify as an

attempt to "influence or affect the conduct of the government…"  and thus does not factually

qualify as a "federal crime of terrorism."

Thus as a hypothetical matter, a person well known to Donald Trump, the person, may

wish to injure or harm him.  But if the person's was motivated by antipathy and their actions

were calculated to inflict injury upon the person they personally knew, the terrorism

enhancement would be inappropriate.  Such is the case here.  The government has not proven

and cannot prove that Ms. Ferrier's actions were calculated to influence or affect the

government.  It is not clear whether Ms. Ferrier found Donald Trump to be personally offensive,

pig-headed, chauvinistic or even simply "ugly."  But the mere fact that he was president at the

time does not convert personal grievances into a terrorist attack.

It is also notable that the letter to Donald Trump was never likely to actually reach the

president.  It is illogical for anyone to believe that the U.S. President opens his own mail.

Different jurisdictions have different approaches on the meaning of "calculated to

influence."  The Eastern District of Virginia describes the "calculated to influence" component

as the "motivational element" and construes the term narrowly.  In *United States v. Benkahla*,

501 F.Supp.2d 748, 752 (E.D.V.A. 2007), the court considered whether 3A1.4 applies to false

statements to a grand jury and the FBI in the context of an investigation into a potential terrorist

organization.  The court determined that the enhancement was limited to "specific

investigations" because investigations into specific offenses "are detailed by a discrete set of facts and circumstances [and] the Government would be able [to] meet its burden by pointing to these specific facts and circumstances to demonstrate that the particular offenses subject of the investigation were 'calculated to influence or affect the conduct of government.'" *Id.*  However, "[i]f the Government cannot point to any specific offenses that it is investigating, it obviously cannot point to any facts or circumstances to show whether those violations were 'calculated to influence or affect the conduct of government,' and thus, it cannot meet its burden." *Id. See also United States v. Mandhai¸*375 F.3d 1243, 1248 (11th Cir. 2004) (holding "it is the defendant's purpose that is relevant, and if that purpose is to promote a terrorism crime, the enhancement is triggered" where defendant's goal was to demand release of Muslim prisoners and changes in foreign policy).   On the other hand, *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010) disagrees:  "Section 2332b(g)(5)(A) does not focus on the defendant but on his 'offense,' asking whether it was calculated, i.e. planned – for whatever reason or motive – to achieve the stated object." *Id.*  "'Calculation' is concerned with the object that the [defendant] seeks to achieve through planning or contrivance.").  Still, under this broader interpretation, there is no evidence of any conduct or policy of government that Ms. Ferrier sought to influence – Ms. Ferrier only sought to influence a controversial person who she intensely from remaining in politics.  There is no evidence that the policies or conduct of the U.S. government were calculated to be influenced.

Similarly, the government cannot carry its burden of demonstrating the "motivational element" because there is no specific conduct that the government alleges that Ms. Ferrier attempted to influence.  There is simply no evidence in this record that the letters were written to influence the conduct of government or to retaliate against government conduct.  Unlike a threat made generally to federal employees or a federal building, the letter was addressed to someone

who prompted strong opinions, both positive and negative. *Cf. United States v. Thomas*, 521 Fed. Appx. 741, 743 (11th Cir. 2013) (upholding terrorism enhancement where defendant goal was to "assault or attack federal employees and federal facilities.").

In *Shehadeh,* the Eastern District of New York provides helpful analysis in distinguishing between the "calculated" act required by §2335b(g)(5) and the "international terrorism" definition in 18 U.S.C. §2331, which includes activities that "appear to be intended (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping." *United States v. Shehadeh,* 2013 WL 6049001 at *3 (E.D.N.Y. 2013). There, the court notes the difference between "appear to be intended" and 'calculated" to have an effect – §2335b(g)(5)'a "relevant intent standard" "requires a more specific showing." *Id.* Here, the government has not made a specific showing that the letters were calculated to have either the impact of influencing the conduct of government or retaliating against government conduct.

The lack of such a specific showing was fatal to the government's argument for a terrorism enhancement in *United States v. Jumaev*, 2018 WL 3490886 at * 6 (D.Col. 2018). There, the Court found that the government had not proved that the defendant committed his act (in this case, to send a $300 check to an organization connected with terrorism) with the intent to contribute to terrorism. The Court also took notice of the defendant's "offenses were not calculated to achieve" the overthrow of a government and reasoned that if his "offenses were truly calculate towards a political objective, [he] would have done more…. Simply put, his offenses were not calculated at all." *Id.* Similarly, it is difficult to see how a letter mailed into the White House, with no additional effort, could actually be designed to achieve a political

10

objective.  And nothing about the stated intentions in the letter involve the objective of influencing or affecting the conduct of government.

Similarly, *United States v. Cheng* declines to apply the terrorism enhancement because the defendant's offenses were "primarily motivated by greed."  2016 WL 413077 at *5 (D. Mass. 2016). The District Court found that the terrorism enhancement did not apply because "there is not enough evidence that the offenses were 'calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct").

Counsel has not found the application of §3A1.4 in similar cases involving threats of ricin sent to politicians.  In *United States v. Shannon Richardson*, 13-cr-13 (E.D. TX 2013e defendant pleaded guilty to sending ricin to President Obama, Mayor Bloomberg and three other public figures.  The defendant there attempted to cast blame on her husband, using accounts under his name.  The ricin was personally opened by at least one target and the letter to President Obama contained a religious slur.  The government did not seek, and the court did not include, a federal crime of terrorism enhancement.  *United States v. Shannon Richardson*, 2018 WL 3352743 (E.D. Texas 2018).

There is no question on this record that Ms. Ferrier has extreme contempt for Donald J. Trump.  But there is a significant question as to whether Ms. Ferrier had similar disdain for the Trump administration and its policies.  The government lacks evidence on this point and the more significant consideration of whether Ms. Ferrier's actions were calculated to influence government policy.  There is no evidence here to support this proposition and the Court should decline to apply this enhancement.

B.  U.S.S.G. § 2M61.b(3)

The Court should also decline to apply the enhancement for substantial disruption

11

because the government has not proven, by a preponderance of the evidence that the offense resulted in substantial disruption of public, governmental, or business functions or services or a substantial expenditure of funds to clean up, decontaminate or otherwise respond to the offense. USSG §2M6.1(b)(3).

Most relevant case law regarding the "substantial disruption" enhancement arises out of application of USSG §2A6.1(b)(4) but both enhancements require the government to demonstrate, by a preponderance of the evidence, that substantial disruption occurred. *United States v. Nissen*, 492 F.Supp.3d 1254, 1260, 1272 (D.N.M. 2020) ("[T]he Court will not apply the 4-level enhancement under U.S.S.G. §2A6.1(b)(4) because the United States has not proven by a preponderance of the evidence that Nissen's offense did not substantially disrupt public functions or cause the NM State Police to expend substantial resources" where "State Police evacuated the entire building" and the "station was 'shut down for at least two hours and numerous agencies were called to assist.'").

The government must not only demonstrate that there was a disruption but also that the disruption was "substantial." Courts have relied upon the plain meaning of the word, defined as "considerable in importance, value, degree, amount or extent" or "of ample or considerable amount, quantity or dimensions." *United States v. Anwar*, 741 F.3d 1134, 1137 (10th Cir. 2013). The government here demonstrates that there was a potential disruption but falls short on demonstrating the extent of that disruption.

The factual record about any potential disruption is contained in paragraph 9 of the Statement of Offense. ECF No. 46. There, Ms. Ferrier agrees: "Special weapons of mass destruction coordinators and hazardous material experts were required to deploy to various locations where the letters were received, due to the presence of the ricin toxin powder in the

envelops.  After investigation, the letters were sent to a special facility in the State of Maryland for safety and for further testing."

Critically, unlike the cases that applied a "substantial disruption" enhancement, no offices or buildings were evacuated here.  The record is also devoid of the time and resources that were expended by experts.  In fact, the discovery notes ~~that~~ there was a disruption that called for a response team on the same day, for an item unrelated to Ms. Ferrier or this case.  The cases that have applied this enhancement appear to have a clear factual record of evacuation or shutting an office down.  For example in *United States v. Carter*, 651 Fed.Appx. 474, 476 (6th Cir. 2016), the enhancement was upheld when a threatening letter shut down the prosecutor's office from 1030 am to the end of the day, and a secretary was placed under observation.  In *United States v. Tucker*, 468 Fed.Appx. 610, 611 (6th. Cir. 2012), a Blue Cross Blue Shield was forced to "completely empty out their headquarters tower downtown, and in the middle of a business day…."  In *United States v. Dudley*,463 F.3d 1221, 1226 (11th Cir. 2006), part of a courthouse was closed for two hours and two judges were unable to conduct business for longer than that. Two individuals were placed on quarantine and a judge was provided 24-hour protection by the Sheriff's office.  In *United States v. Anwar*, 741 F.3d 1134, 1140 (10th Cir. 2013), application of the enhancement was upheld where bomb threat "shut down an entire building, causing law enforcement to 'shut down an entire building, causing the evacuation of 240 people and the interruption of 14 classes.'"  In *United States v. Sanders*, 511 Fed.Appx. 463, 466 (6th Cir. 2013), the Court upheld the application of the enhancement in a case where the defendant made a prank call about a boat that had capsized in Lake Erie.  As a result, about forty Coast Guard personnel searched approximately ninety miles of coast line and placed personnel involved at great risk." *Id.* at 467.  In *United States v. Snipes*, 466 Fed.Appx. 800 (11th Cir. 2012), the Court upheld the

13

enhancement where the defendant threatened to attack a National Guard training exercise.  At least 30 soldiers were pulled from their assignments for security and additional state law enforcement was deployed across several facilities over a two-day period.  *Id.* at 802.

In contrast, in *United States v. Nissen*, 492 F.Supp.3d 1254, 1281 (D.N.M. 2020), the Court determined that there was no substantial disruption of police operations where the defendant repeatedly threatened to harm police officers and left an unknown object in front of the State Police office, which the defendant described as a "gift."  The Bomb Squad was called and the station was "shut down for at least two hours and numerous agencies were called to assist."  *Id.* at 1260.  Still, the court found that "[t]his is not the degree of disruption that §2A6.1(b)(4) contemplates.  The phrase 'substantial disruption of functions or services' …suggests a significant interruption of normal activities when measured by scope and time.'" *Id.* at 1281-82 (quoting *United States v. Anwar*, 741 F.3d at 1137)). And in *United States v. Wyrick*, 416 Fed.Appx. 786, 790 (10th Cir. 2011), the Court declined to apply the enhancement based solely upon the subsequent investigation because otherwise "the enhancement would apply any time there is a substantial investigation."  *Id.*

The record in this case is absent of any evidence of substantial disruption to the business activities of the White House or the Texas facilities.  There is no evidence of any offices being shut down or evacuated, any suspension of activities or any individuals placed in quarantine or under observation after exposure.  There is no evidence that a mass of individuals were reassigned away from their normal duties because of an elevated security threat.  In sum, the record is devoid of evidence of a substantial interruption and this enhancement should not be applied.

II.     Alternatively, the guideline range grossly overstates Ms. Ferrier's criminal history

because she is a first-time offender.

Ms. Ferrier has no prior criminal offenses in over fifty years of life.  However, if the Court applies U.S.S.G.  §3A1.4(a), her criminal history vaults from category I to category VI. This increase is among the greatest contained within the Sentencing Guidelines and nearly doubles her Sentencing Guideline range and amounts to impermissible double counting.  Ms. Ferrier has no prior convictions and she would still receive a sentence equivalent to that of a life-long terrorist.

Courts have disapproved the approach of the terrorism guideline, one likening it to the "roundly criticized" child pornography guideline.  *United States v. Dais*, 482 F.Supp.3d 800, 802 (E.D. Wisc. 2020) points out that the guideline is "contrary to the purposes of sentencing in 18 U.S.C. §3553(a), including the notion that sentences should be individualized and proportionate, and that we should distinguish between the worst offenders and those who are less dangerous." *Id.*  The District Court reasons:

> It is also contrary to the theory behind the guidelines: that the offense level will reflect the seriousness of the offense, increasing incrementally based on specific aggravating facts, and the criminal history category will reflect the risk to the public, based on the defendant's prior record.  As Judge Breyer has noted, the terrorism enhancement "takes a wrecking ball" to this construct.  Terrorism cases are undoubtedly serious, but automatically increasing a defendant's criminal history to reflect the seriousness of the charged offense seems misguided…. Finally, as both Judges have noted, this guideline was enacted pursuant to a congressional directive and absent empirical evidence.  Such guidelines do not exemplify the Sentencing Commission's exercise of its characteristic institutional role, and are generally entitled to less respect.

*Dais,* 482 F.Supp at 803 (citations omitted).

### III.    Application of the 3553 Factors

### A.  The Appropriate Sentence is 262 months with no supervised release.

When sentencing a defendant, the Court must treat the Guidelines "as one factor among

several" that § 3553(a) requires the Court to consider. *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). Once the Court correctly calculates the sentence that the Guidelines recommend, the Court must then "make an individualized assessment," considering the remaining factors set forth in § 3553(a). *Gall v. United States*, 552 U.S. 38, 50 (2007). Because the Guidelines merely reflect a "wholesale" view "rough[ly] approximat[ing] . . . sentences that might achieve § 3553(a)'s objectives," *Booker* and § 3553(a) require the Court to tailor an individualized sentence that actually does achieve § 3553(a)'s objectives in the case before it. *Rita v. United States*, 551 U.S. 338, 348, 350 (2007). This Court should not presume that a Guidelines sentence is reasonable and should, instead, consider whether or not the applicable Guidelines sentence properly reflects § 3553(a) considerations and whether "the case warrants a different sentence regardless." *Id.* at 351. Indeed, "it remains the judge's duty to tailor every sentencing to the case and defendant at hand," regardless of the guidelines range. *United States v. Sabillon-Umana*, 772 F.3d 1328, 1330 (10th Cir. 2014) (Gorsuch, J.). Recently, a U.S. District Court Judge explained the following:

> During the sentencing hearing, the lawyers and the judge discuss the appropriate sentence, often at great length, but after the judge announces a decision, that judge, the lawyers, and the staff move on to the next case; the hearing and outcome soon fade into distant memory. Meanwhile, for the defendant, the torture of a monotonous existence begins, while life for his family moves forward without him. For him, every day, month and year that was added to the ultimate sentence will matter. The difference between ten and fifteen years may determine whether a parent sees his child graduate from high school; the difference between ten and fifteen months may determine whether a son sees his sick parent before that parent passes away; the difference between probation and fifteen days may determine whether the defendant is able to maintain his employment and support his family. *Thus, it is crucial that judges give careful consideration to every minute that is added to a defendant's sentence. Liberty is the norm; every moment of incarceration should be justified.*

*United States v. Faison*, No. GJH-19-27, 2020 U.S. Dist. LEXIS 27643, at *3-4 (D. Md. Feb. 18, 2020) (emphasis added).

### B.  The History and Characteristics of Ms. Ferrier

Ms. Ferrier is an exceptionally intelligent and accomplished woman who overcame the difficulties of being a single mother from the 1990's, successfully immigrated to another country and raised two teenagers alone and in a foreign land.  Her experience reflects an immigrant's passion, as she worked as a cashier when she could not find a job in her field despite her Masters degree in engineering. Once she settled down in Canada, she earned a second degree and became accomplished in the software engineering field.  She even started her own business in web development.  She returned to work for a company in software configuration management and was working there at the time of her arrest.

Ms. Ferrier has impressed the professors at Georgetown Scholars and they all marvel at her hard work and intelligence.  More importantly, she brought a thoughtful and cooperative eye towards other students, some of whom came from extremely different backgrounds.  She was generous with both her time and her perspective and was noted to "desire and to assist others."

### C.  The Nature and Circumstances of the Offense

Although this was undeniably a serious offense, no individuals were injured or even placed under observation and there was little reported disruption to business.

### D.  The Need for the Sentence Imposed

18 U.S.C. § 3553(a) directs the Court to consider four objectives of federal sentencing to impose a sentence that is "sufficient, but not greater than necessary" to achieve those goals.  The first purpose is to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).  Ms. Ferrier accepted responsibility for her actions and has demonstrated through her time at CTF of her desire to

rehabilitate.  She has completed every certification available to her, performed diligently on

detail, and earned accolades from college professors for her work within the Georgetown

Scholars program.  She has not received any disciplinary infractions in her two years at CTF.

### E.  A Sentence Below the Guideline is Not an Unwarranted Sentencing Disparity

A 262 month sentence for Ms. Ferrier would not create an unwarranted sentencing

disparity. Shannon Richardson is the most comparable case as she too had no criminal record

though she also attempted to frame her husband for the five letters she sent.  *United States v.*

*Shannon Richardson*¸13-cr-13 (E.D.TX. 2013).

James Dutschke received a harsher sentence of 25 years but the facts of his case are

readily distinguishable.  *United States v. James Dutschke*, 13-cr-81 (N.D. Miss. 2013).  Dutschke

sent at least three letters and one reached his intended target.  He falsely accused another

individual of his actions (for which that person was detained).  His sentence was also inflated

because he was also resolving a sex offense charge where he received a concurrent sentence of

twenty years of incarceration in state court.  https://www.jacksonville.com/story/news/nation-

world/2014/05/19/mississippi-man-sentenced-25-years-sending-ricin-laced-letters/15795666007/

F.  Supervised Release is Inappropriate in this case.

The Court should not impose a term of supervised release in this case as Ms. Ferrier has

consented to her removal as a deportable alien.  The Sentencing Guidelines state:

> The court ordinarily should not impose a term of supervised release in a case in
> which supervised release is not required by statute and the defendant is a
> deportable alien who likely will be deported after imprisonment.

U.S.S.G. §5D1.1(c)

### Conclusion

A sentence of 262 months for a fifty-six year old woman with no prior criminal record is

an exceptionally serious consequence that will more than adequately punish Ms. Ferrier for her

conduct and will also adequately deter any future wrongful conduct.  This sentence was designed

so that Ms. Ferrier would have hope of surviving prison and seeing her grandchildren. Thus, for

the reasons stated above, including Ms. Ferrier's history and characteristics, together with the

other goals of sentencing, Ms. Ferrier respectfully requests that the Court impose the sentence

determined to be appropriate by the government and U.S. Probation.


Respectfully submitted,


A.J. KRAMER
FEDERAL PUBLIC DEFENDER


_____/s/_____
EUGENE OHM
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500